## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-03860-SBP

DENIIS MERCHAN-PACHEO,

      Petitioner,

v.

KRISTI NOEM, *Secretary, U.S. Department of Homeland Security*; PAM BONDI, *U.S. Attorney General*; TODD M. LYONS, *Acting Director, U.S. Immigration and Customs Enforcement*; ROBERT GUADIAN, *Denver Field Office Director, U.S. Immigration and Customs Enforcement*; and JUAN BALTAZAR, *Warden of Denver Contract Detention Facility*,

      Respondents.

---

## MEMORANDUM OPINION AND ORDER

---

**Susan Prose, United States Magistrate Judge**

      Before the Court is Petitioner Deniis Merchan-Pacheo ("Petitioner")'s Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief, ECF No. 1 ("Petition"), and Motion for a Temporary Restraining Order and Preliminary Injunction. ECF No. 2. For the reasons outlined below, the court respectfully **GRANTS** the Petition and **DENIES** the motion **as moot**.

## I.      BACKGROUND

      Petitioner is a native and citizen of Ecuador who arrived in the United States on September 7, 2021, as a 16-year old unaccompanied minor. ECF No. 1 at ¶ 19. United States authorities classified Petitioner as an "Unaccompanied Alien Child" (or "UAC") and transferred him to the Office of Refugee Resettlement, a subdivision of the Department of Health and

Human Services, which determined that Petitioner met relevant criteria for "Unaccompanied Alien Child" status, initiated reunification procedures mandated by this status, and ultimately approved Petitioner's mother, who was residing in the United States, as his sponsor. *Id*. at ¶ 20. On September 20, 2021, Petitioner was released into his mother's care and moved into her home in Orlando, Florida. *Id*. at ¶ 21. To date, Petitioner has no criminal history. *Id*. at ¶ 25.

On September 17, 2023, the Department of Homeland Security ("DHS") issued Petitioner a notice to appear in immigration court, commencing removal proceedings against him under 8 U.S.C. § 1229a. *Id*. at ¶ 21. Petitioner subsequently sought refuge through the asylum process, being included as a derivative beneficiary on his mother's Form I-589 asylum application filed on March 5, 2025, and filing his own Form I-589 naming himself as the principal applicant on August 8, 2025. *Id*. at ¶¶ 23-25. Petitioner has since refiled his application with U.S. Citizenship and Immigration Services, which remains pending. *Id*. at ¶ 25.

On August 8, 2025, Petitioner was stopped by the Florida Highway Patrol, allegedly without cause; the state trooper questioned Petitioner's immigration status and contacted federal authorities, who arrived and took Petitioner into custody. *Id*. at ¶ 26. Immigration and Customs Enforcement ("ICE") served Petitioner with a Warrant for Arrest of Alien (Form I-200) and a Notice of Custody Determination (Form I-286) on or about the same day. *Id*. Petitioner states that those documents cited 8 U.S.C. § 1226 as the source of Petitioner's detention. *Id*.

On August 14, 2025, Petitioner was lodged in immigration detention at the Denver Contract Detention Facility in Aurora, Colorado, within this court's jurisdiction. *Id*. at ¶ 27. On August 27, 2025, Petitioner was denied bond by Immigration Judge Melanie Corrin. *Id*. at ¶ 28. On October 16, 2025, Petitioner filed his Form I-589 asylum application with U.S. Citizenship

2

and Immigration Services; with his asylum application pending, he filed a new bond request on November 14, 2025. *Id*. at ¶ 30. On November 19, 2025, Judge Corrin granted Petitioner's bond request, finding that Petitioner was not in mandatory detention under 8 U.S.C. § 1225(b)(2)(A), but rather in discretionary detention under 8 U.S.C. § 1232(a)(5)(D),[1] and that Petitioner merited release on bond; she ordered bond set at $25,000. *Id*. at ¶ 31; *see also* ECF No. 1-1 at 53. Petitioner's family subsequently paid this bond. ECF No. 1 at ¶ 32.

The DHS moved to prevent Petitioner's release, filing a notice of intent to appeal the bond decision to the Board of Immigration Appeals ("BIA") on November 20, 2025. *Id*. at ¶ 33. The DHS's appeal invoked an automatic stay of the immigration judge's bond order; as a result, despite the bond having been paid, Petitioner was not released and remains detained in Aurora. *Id*. The automatic stay is invoked under 8 C.F.R. § 1003.19(i)(2), which provides:

> ***Automatic stay in certain cases.*** In any case in which DHS has determined that an alien should not be released or has set a bond of $10,000 or more, any order of the immigration judge authorizing release (on bond or otherwise) shall be stayed upon DHS's filing of a notice of intent to appeal the custody redetermination (Form EOIR-43) with the immigration court within one business day of the order, and, except as otherwise provided in 8 CFR 1003.6(c), shall remain in abeyance pending decision of the appeal by the Board. The decision whether or not to file Form EOIR-43 is subject to the discretion of the Secretary.

The automatic stay lapses after 90 days, absent a BIA decision. 8 C.F.R. § 1003.6(c)(4*); see also Carlon v. Kramer*, No. 25-cv-3178, 2025 WL 2624386, at *1 (D. Neb. Sept. 11, 2025). However, the government can extend the detention by seeking a discretionary stay from the BIA at the

---

[1] Petitioner states that Judge Corrin expressly found that he should be released on bond pursuant to 8 U.S.C. § 1226. However, Judge Corrin cites only 8 U.S.C. § 1232(a)(5)(D) in reaching her determination. Whatever the case, it is uncontested that Judge Corrin has found that Petitioner is subject to discretionary rather than mandatory detention.

expiration of the stay, which automatically extends the stay for an additional 30 days while the

BIA decides the request for discretionary stay. 8 C.F.R. § 1003.6(c)(5). If the BIA authorizes an

alien's release (on bond or otherwise), denies a motion for discretionary stay, or fails to act on

such a motion before the automatic stay period expires, the alien's release shall be automatically

stayed for five business days. 8 C.F.R. § 1003.6(d). During that period, DHS can choose to refer

the bond decision to the Attorney General, which extends the automatic stay for another 15

business days. 8 C.F.R. § 1003.6(d). The Attorney General can then extend the stay for the

pendency of the custody proceedings. 8 C.F.R. § 1003.6(d).

Petitioner has now filed this Petition against Kristi Noem in her role as the Secretary of

the DHS; Pam Bondi in her role as the U.S. Attorney General; Todd Lyons in his role as the

Acting Director of ICE; Robert Guadian in his role as the Denver Field Office Director for ICE;

and Juan Baltazar in his role as the Warden of the Denver Contract Detention Facility

("Respondents"), seeking habeas relief and requesting that the court enter an order immediately

releasing him. ECF No. 1. Petitioner's motion for a temporary restraining order requests similar

relief. ECF No. 2. Respondents appear to acknowledge that the arguments raised and relief

sought in both the Petition and the motion are the same, as they address both simultaneously

within a consolidated brief. "Response," ECF No. 12. Respondents also state that they believe

that Petitioner's detention may be continued pursuant to 8 U.S.C. § 1225(b). *Id*. at 4.

Respondents raise several arguments in response to Petitioner. First, Respondents argue

that Petitioner's challenge lacks merit because Petitioner is subject to mandatory detention

during his removal proceedings and the Supreme Court has held that such detention does not

raise constitutional concerns. Response at 5-9. Second, Respondents argue that Petitioner's

challenge of the stay of his release on bond lacks merit because the Supreme Court has upheld detentions while removal proceedings are pending. *Id*. at 9-10. Third, Respondents argue that Petitioner's challenge of the stay lacks merit because the three-factor test Petitioner cites in support of his Petition does not apply. *Id*. at 11. Fourth, Respondents argue that Petitioner's ultra vires challenge lacks merit. *Id*. at 12-14. Fifth and finally, Respondents argue that Petitioner has failed to establish a right to relief based on warrantless arrest regulations. *Id*. at 14-15.

The parties have consented to this magistrate judge's jurisdiction. ECF No. 10; *see* 28 U.S.C. § 636(c), Fed. R. Civ. P. § 72. The court held oral argument on Petitioner's motions on January 9, 2026. *See* ECF No. 13. During oral argument, the parties raised additional points not discussed within their briefing, as explained below.

## II.    ANALYSIS

District courts may grant a writ of habeas corpus to any person who demonstrates he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The individual in custody bears the burden of proving that his detention is unlawful. *Walker v. Johnston*, 312 U.S. 275, 286 (1941).

As an preliminary matter, though the parties offer extensive argumentation as to whether § 1225 or § 1226 applies to Petitioner, and although the court addresses those arguments below, the court finds that it need not evaluate these arguments in order to reach a determination here. Judge Corrin has already ruled that Petitioner is subject to discretionary, not mandatory, detention. Accordingly, despite Respondents' pending appeal to the BIA arguing that Judge Corrin's decision is incorrect, the court recognizes that but for the automatic-stay provision of 8 C.F.R. § 1003.19(i)(2) invoked by this appeal, Petitioner would no longer be detained. As a

result, "[f]or the time being, the Court is concerned only with the lawfulness of the automatic stay, the present basis for Petitioner's detention. Accordingly, the Court turns to Petitioner's arguments for why her detention is unlawful . . . ." *Carlon v. Kramer*, 2025 WL 2624386, at *3; *see also, e.g.*, *Castillo v. Andra-Ybarra*, No. 25-cv-1074-JB-JFR, 2025 WL 3251223, at *6 (D.N.M. Nov. 21, 2025) (addressing whether to apply § 1225 or § 1226 to a petitioner who had *not* been granted bond, but limiting analysis to the automatic stay issue as to another petitioner who had been granted bond but whose release had been stayed pending appeal).[2] *But see Rojas v. Olson*, No. 25-cv-1437-BHL, 2025 WL 3033967, at *9 (E.D. Wis. Oct. 30, 2025) (finding that § 1225(b)(2) applied to a petitioner where the petitioner had been granted bond pursuant to § 1226(a), but not addressing whether the issue of which provision applied was properly before the court). Indeed, at oral argument, both Petitioner and Respondents acknowledged that, given Judge Corrin's ruling, the court could rest its analysis on the automatic stay issue.[3]

Respondents argue that "*mandatory* detention during the pendency of removal proceedings does not violate due process" (emphasis added) and that since "Congress has authorized *mandatory* detention of Petitioner" (emphasis added) pursuant to § 1225(b)(2)(A), "Congress has not provided Petitioner the right to be released on bond pending appeal of an immigration judge's order." However, Respondents ignore that Judge Corrin found that

---

[2] The court notes that Respondents are not foreclosed from challenging Judge Corrin's ruling directly; they may appeal her ruling to the BIA, as they have already done.

[3] While Respondents subsequently suggested that the court might find it necessary to address the § 1225/§ 1226 issue, Respondents ultimately acknowledged that the claims before this court do not require examination of the substance of Judge Corrin's decision and that this court does not have the jurisdiction to set aside Judge Corrin's ruling.

Petitioner's detention is *not* mandatory and that Petitioner may be released on bond. Accordingly, despite Respondents' representations, Judge Corrin has held that Petitioner does have the right to be released on bond because he is not subject to mandatory detention. The court does not find that Petitioner has asked this court to revisit Judge Corrin's holding, and regardless, declines to do so (though, as stated above, the court nevertheless provides its analysis of the issue below).[4] Accordingly, the court finds that it need not address under which provision of law Petitioner has been detained, and instead turns to analyze whether the automatic stay violates Petitioner's due process rights.

### A. Procedural Due Process

The court first turns to the parties' arguments as to which standard the court should apply in conducting its due process analysis.

#### 1.    *Demore and Related Rulings*

In their briefing and at oral argument, Respondents have argued that the three-factor test set forth in *Mathews v Eldridge*, 424 U.S. 319, 335 (1976), does not apply in this context, although they acknowledge that this test has frequently been applied by other courts in this context. Respondents state that in *Demore v. Kim*, 538 U.S. 510 (2003), the Supreme Court did not look to the *Mathews* factors, but nevertheless reached the conclusion that "[d]etention during

---

[4] The court notes that throughout their briefing, Respondents frequently rely on the assertion that Petitioner is subject to mandatory detention, not discretionary detention. *See, e.g.*, Response at 10 (stating that "Congress has authorized mandatory detention of Petitioner" pursuant to § 1225 in arguing of the automatic stay that "Congress may make rules as to aliens that would be unacceptable if applied to citizens." For the reasons stated above, the court respectfully disagrees with this assertion. Nonetheless, the court proceeds to evaluate Respondents' arguments containing this assertion, construing them so as to elide this underlying assumption and address what substance remains whenever possible.

removal proceedings is a constitutionally permissible part of that process." *Id.* at 531. As a result, Respondents argue that the court need not look beyond this principle in reaching its holding here and can ignore the test set forth in *Mathews*.

The court first notes that *Demore* involved a very different set of circumstances from those alleged here. In *Demore*, the petitioner did not contest that he had committed and had been convicted of crimes, that he was subject to mandatory detention, or that he was subject to being deported; instead, the petitioner merely contested his continued detention without bond pending his deportation. *Demore*, 538 U.S. at 513-14 (Respondent "conced[ed] that [the petitioner] was deportable" and "does not dispute the validity of his prior convictions, which were obtained following the full procedural protections our criminal justice system offers. Respondent also did not dispute the INS' conclusion that he is subject to mandatory detention under § 1226(c).").

The court also notes that *Demore* itself does not say (or imply) anything about ignoring the *Mathews* factors. Instead, *Demore* includes several approving citations to *Mathews* within the majority ruling, and many courts, including courts within this District, routinely look to the *Mathews* factors in considering whether detention of noncitizens during removal proceedings violates due process. *See, e.g.*, *L.G. v. Choate*, 744 F. Supp. 3d 1172, 1181 (D. Colo. 2024) (applying *Mathews* in a similar context and stating that "Tenth Circuit precedent demonstrates that the *Mathews* test is appropriate when determining what process is constitutionally due."); *Vizguerra-Ramirez v. Baltazar*, No. 25-cv-00881-NYW, 2025 WL 3653158, at *13 (D. Colo. Dec. 17, 2025) (applying *Mathews* in a similar context); *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022) (collecting cases and noting that "when considering due process challenges to [discretionary noncitizen detention,] other circuits . . . have applied the *Mathews*

test"); *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021) (applying *Mathews* test to

§ 1226(a) challenge); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (same); *Carlon*

*v. Kramer*, 2025 WL 2624386; *Ashley v. Ridge*, 288 F. Supp. 2d 662, 670 (D.N.J. 2003);

*Gunaydin v. Trump*, 784 F. Supp. 3d 1175, 1185 (D. Minn. 2025). Consistent with these prior

holdings, the court does not understand *Demore* to either hold or imply that the *Mathews* factors

should never be relied upon when considering whether detention of noncitizens during removal

proceedings violates due process.

      Relatedly, the court disagrees with Respondents' seeming assertion that the Supreme

Court's holding in *Demore* that "[d]etention during removal proceedings is a constitutionally

permissible part of that process" represents a blanket rule that permits *any* form of detention of

any noncitizen pursuant to *any* provision of law during removal proceedings. Although *Demore*

certainly makes it clear that detention during removal proceedings is permissible under certain

circumstances—such as where a noncitizen subject to mandatory detention has already conceded

that he is subject to deportation—it does not follow that *all* forms of detention of noncitizens

during removal proceedings and all related procedures comport with due process. *Cf., e.g.*,

*Herrera v. Knight*, 798 F. Supp. 3d 1184, 1202 (D. Nev. 2025) (the court contrasting detention

pursuant to the automatic stay with mandatory detention pursuant to § 1226(c) and noting that

"as the Supreme Court in <u>Demore</u> highlighted in upholding the mandatory detention of a

noncitizen convicted of a crime under § 1226(c), 'process' has been built into that mandatory

detention scheme" via underlying criminal prosecutions and convictions); *L.G. v. Choate*, 744 F.

Supp. 3d at 1182 ("Even if Petitioner is a noncitizen in removal proceedings, that does not mean

that he does not have a strong private interest in being free from civil detention."). *Demore* itself

acknowledges that "[i]t is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Demore*, 538 U.S. at 523 (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)). And *Demore* explains at length that its holding can be differentiated from *Zadvydas v. Davis*, 533 U.S. 678 (2001), in part because "in adopting § 1226(c), Congress had before it evidence suggesting that permitting discretionary release of aliens pending their removal hearings would lead to large numbers of *deportable criminal* aliens skipping their hearings and remaining at large in the United States unlawfully." *Demore*, 538 U.S. at 528 (emphasis added). This discussion strongly suggests that were Congress *not* to authorize a specific form of detention during removal proceedings, if Congress did not have legitimate policy concerns in mind in doing so, or if the petitioner at issue had not been found guilty of criminal acts, then the Supreme Court's analysis would be different. Accordingly, this court's analysis cannot rest solely upon the principle that detention during removal proceedings is constitutionally permissible, as the court concludes that *Demore*'s analysis plainly does not exclusively rest on this premise either.

Respondents also cite *Demore* for the proposition that "noncitizens who [a]re convicted of certain crimes may be detained during the course of their removal proceedings" in part because of the "definite termination point" of the end of removal proceedings, then argue that because detention with a "definite termination point" is not de facto unlawful and that "the Supreme Court has never held that a noncitizen has a due process right to a bond hearing during removal proceedings that have a definite termination point," this principle should be extended to *all* noncitizens undergoing removal proceedings. *Id*. at 531. Relatedly, in arguing that § 1225 applies here, Respondents incidentally cite multiple cases from this District purportedly standing

for the proposition that the "definite termination point" of the detention at the end of removal proceedings assuages constitutional concerns. *See Basri v. Barr*, 469 F. Supp. 3d 1063, 1073-74 (D. Colo. 2020); *Aguayo v. Martinez*, No. 20-cv-00825-DDD-KMT, 2020 WL 2395638, at *3 (D. Colo. May 12, 2020); *Orande Ahinsha Richards v. Choate*, No. 25-cv-03134-DDD-STV (D. Colo. Dec. 5, 2025), ECF No. 19.

The court notes that, as with *Demore*, each of the cases Respondent cites are readily distinguishable from the present matter because they deal with petitioners subject to mandatory detention. Each of these cases refers to mandatory detention pursuant to § 1226(c), which applies only to individuals who have been convicted of specific crimes. There is no indication that Petitioner has ever been convicted of any crime, and Respondents do not argue otherwise, nor do they argue that Petitioner may be considered to have been detained pursuant to § 1226(c). *See Herrera v. Knight*, 798 F. Supp. 3d at 1202 (in contrast to detention pursuant to the automatic stay process, "process has been built into the mandatory detention scheme" under § 1226(c) via the process provided within underlying criminal convictions).

Additionally, as referenced above, the court notes that the "definite termination point" referenced in *Demore* was only one factor the Supreme Court has considered in ruling against the petitioners; as discussed above, other factors include policy issues surrounding "criminal" aliens and, relatedly, the fact that Congress had properly authorized mandatory detention of the petitioners without bond due (at least in part) to these policy concerns. Indeed, the principles that the Supreme Court relies upon in *Demore* to rule against the petitioners are understandably not fully applicable in this context, because in *Demore* the parties did not dispute that the petitioners were subject to § 1226(c), which mandates detention of "criminal" noncitizens. For instance, as

referenced above, *Demore* frequently references the fact that § 1226(c) applies to the *criminal* noncitizens at issue while noting that Congress made detention of these *criminal* noncitizens mandatory; the Supreme Court, in reaching its holding, frequently stresses the "criminal" conduct of the petitioners and relies in part on the premise that mandatory detention pursuant to § 1226(c) serves a legitimate policy purpose because it "prevents deportable *criminal* aliens from fleeing prior to or during their removal proceedings . . . ." *Id.* (emphasis added). Here, in contrast, Judge Corrin has held that Petitioner's detention is *not* mandatory, and there is no indication that Petitioner has ever been accused or convicted of any crime.

Relatedly, as with § 1225(b)(2)(A), detention of "criminal" aliens pursuant to § 1226(c) is mandatory, the provision stating that the Attorney General "shall" take any alien falling under the ambit of the provision into custody. *See, e.g.*, *Demore*, 538 U.S. at 517-18 (§ 1226(c) "mandates" detention during removal proceedings). § 1226(c) is properly construed as setting forth "exceptions" to the discretionary detention provided for by § 1226(a), and in fact, federal regulations specifically entitle noncitizens in discretionary detention pursuant to § 1226(a) to bond hearings at the outset of detention. *See, e.g.*, *Hernandez v. Baltazar*, 2025 WL 2996643, at *3-4 ("Subject to some limited exceptions, *see, e.g.*, § 1226(c), § 1226(a) provides the Attorney General with discretion to release a noncitizen on bond pending a removal decision. . . . Federal regulations also provide that noncitizens detained pursuant to § 1226(a) are entitled to individualized bond hearings."); *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (in contrast to § 1226(c), "[f]ederal regulations provide that aliens detained under § 1226(a) receive bond hearings at the outset of detention.") (citing 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1)). *Cf., e.g.*, *Ahinsha Richards*, ECF No. 19 at 13 (relying on the premise that "the procedures authorized by

12

Section 1225(b) do not provide for bond hearings or place a time limit on detention while removal proceedings are pending," in finding that the petitioner could not argue that he did not receive the process Congress has established for detainees in his circumstances). Respondents do not address the argument that federal regulations provide for fundamentally different treatment of noncitizens in discretionary detention and noncitizens in mandatory detention pursuant to either § 1226(c) or § 1225(b)(2)(A).

Accordingly, although the court may consider Petitioner's "definition termination point" argument, as appropriate, in weighing factors relevant to the due process analysis here, it would *not* be appropriate to extend *Demore*'s holding wholesale to a discretionary detention context, where Congress has not installed prohibitions on obtaining bail. Indeed, in reaching its holding, *Demore* relies upon *Mathews* for the proposition that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Id*. at 521. Here, however, Petitioner has indisputably been awarded bond by an immigration judge pursuant to a provision of law under which Congress has *not* mandated that he remain detained; rather, Petitioner *must* be provided with a bond hearing. As a result, the court concludes that under *Demore* and its progeny, Congress has made no rule that would prevent Petitioner from being released on bond here, but instead has created a framework that *permits* Petitioner's release.

The court therefore concludes that, despite Respondents' arguments otherwise, *Demore* in no way suggests that the court should decline to consider the *Mathews* factors here.

### 2.    *Ahinsha Richards*

At oral argument, Respondents additionally referenced *Ahinsha Richards*, No. 25-cv-

03134-DDD-STV, ECF No. 19, as setting forth an exemplar of the due process analysis Respondents believe this court should follow in light of *Demore*. *See, e.g., Ahinsha Richards* at 12 (stating that "procedural due process does not afford inadmissible arriving aliens subject to prolonged detention a right to release or a bond hearing prior to the conclusion of removal proceedings"). But any support that this analysis might initially seem to provide for Respondents falls apart upon closer examination.

Respondents' arguments in *Ahinsha Richards*—in which, the court notes, the petitioner had *never* been found to be subject to discretionary detention—rested on two factors that are indisputably not the case where Petitioner is *discretionarily* detained: namely, "that Petitioner's detention is lawful because he is a noncitizen subject to *mandatory* detention while his removal proceedings remain pending and due process *does not* require a bond hearing before the removal proceedings are final." *Ahinsha Richards*, ECF No. 19 at 4 (emphasis added). The court made it clear that the fact that "the procedures authorized by Section 1225(b) do not provide for bond hearings" was relevant to its conclusion that the petitioner could be detained without his due process rights being violated. *Id*. at 13 (finding, as a result, that petitioner "does not and cannot argue that he is not receiving the process Congress has established for detainees in his circumstances") (citation omitted). Again, here, Judge Corrin has ruled that Petitioner is subject to discretionary rather than mandatory detention, has granted him a bond hearing, and has awarded him bond, so the court need not reach this issue. While the parties dispute whether Petitioner is subject to discretionary detention, the parties do not dispute that if Petitioner *is* subject to discretionary detention, then Congress has entitled him to a bond hearing. Additionally, *Ahinsha Richards* did not directly discuss whether it would be appropriate to apply

14

the *Mathews* factors in this context. Accordingly, the court declines to look to the *Ahinsha Richards* due process analysis here, as the underlying substance is too removed from the present facts.[5]

In sum, for each of the reasons stated above, the court concludes that the Supreme Court's holding in *Demore* is fully consistent with the application of the *Mathews* test.

### 3.    *Hussain*

Before turning to examine the *Mathews* factors, the court considers an additional argument offered by Respondents. At oral argument, Respondents referred to *Hussain v. Gonzales*, 492 F. Supp. 2d 1024, 1032 (E.D. Wis.), *aff'd sub nom. Hussain v. Mukasey*, 510 F.3d 739 (7th Cir. 2007), as supporting their argument that the automatic stay is consistent with due process. Respondents cite no similar analysis from other cases.

The court does not agree that *Hussain* provides any significant support for Respondents' position. In *Hussain*, which involved an individual who had criminal charges pending against him and whom DHS had accused of being "a member of a terrorist organization who had engaged in terrorist activity," *id*. at 1028, the court's discussion of the automatic stay issue appeared in dicta, the court having found that the issue was already moot.[6] *See, e.g.*, *Campos*

---

[5] The court also notes that, if anything, the court's analysis in *Ahinsha Richards* supports Petitioner here. Due to its partial reliance on the premise that the petitioner could *not* argue that he had failed to receive the process Congress established for him, *see id*. at 13, the *Ahinsha Richards* analysis at least arguably implies that because Judge Corrin has found that Petitioner is subject to a provision of law under which he *is* entitled to a bond hearing, and has granted him bond as a result, then he must be released in order for him to receive due process.

[6] Even if the court had reached a ruling on the automatic stay issue, the decision from another federal district court would not be binding upon this court.

*Leon v. Forestal*, No. 25-cv-01774-SEB-MJD, 2025 WL 2694763, at *5 (S.D. Ind. Sept. 22,

2025) (declining to consider *Hussain* in an automatic stay context because "the court plainly

acknowledged that the [automatic stay] issue was moot because the petitioner was no longer

detained pursuant to the automatic stay"). As an initial matter, this court is reluctant to rely upon

one court's analysis of the automatic stay issue stated in dicta when many other courts have

analyzed this issue directly, and more thoroughly, in the process of reaching their rulings.

Moreover, in discussing the automatic stay in dicta, the court's analysis was

understandably cursory and did not, for instance, discuss what factors or considerations would be

appropriate to evaluate in a due process context (such as the *Mathews* factors), instead resting its

due process discussion on the principle that "providing for an automatic stay until the BIA can

review the IJ's order for release is not unreasonable" because—in contrast to cases with

indefinite stays—"the automatic stay will lapse 90 days after the filing of the notice of appeal."

*Hussain*, 492 F. Supp. 2d at 1032. The court also cited the Attorney General's opinion, set forth

in the Federal Register, that "certain bond cases require additional safeguards before an alien is

released during the pendency of removal proceedings against him or her. In these cases, the

immigration judge's order is only an interim one, pending review and the exercise of discretion

by another of the Attorney General's delegates, the Board. . . ." *Id.* (citing 71 Fed. Reg. 57873,

80). Accordingly, the court concluded that "the challenged regulation reveals the division of

authority the Attorney General has established within the executive branch to exercise his overall

authority to determine the custodial status of aliens facing removal proceedings," and stated that

"[i]t is difficult to see how DHS's exercise of its responsibilities within that system operates as a

denial of due process." *Id.*

Despite what *Hussain*'s justifiably limited discussion of the stay issue might suggest, and even assuming that DHS has not overstepped its authority in implementing the automatic stay, this does not inexorably lead this court to the conclusion that the automatic stay comports with due process—far from it.[7] *See, e.g.*, *Almeida De Souza v. Moniz*, No. 25-cv-12509, 2025 WL 3101763, at *4 (D. Mass. Nov. 6, 2025) (considering *Hussain*, but nonetheless applying the *Mathews* factors and finding, in a similar context, that "[t]he Attorney General's authority to regulate immigration does not justify depriving Petitioner of his liberty without constitutionally adequate process"); *Maza v. Hyde*, No. 25-cv-12407-IT, 2025 WL 2951922, at *4 (D. Mass. Oct. 20, 2025) (considering *Hussain*, but nonetheless applying the *Mathews* factors and finding that

_____

[7] Although the court need not reach this issue here, the court is also not convinced that DHS has stayed within the bounds of its intended authority in recent months in implementing the stay. For instance, the court notes that despite the Attorney General's statement that the automatic stay provision exists to enable DHS "to invoke the automatic stay with respect to aliens whom it believes are potentially dangerous, or are at risk of absconding prior to the conclusion of removal proceedings, or whose cases DHS believes otherwise present important considerations calling for detention during the course of removal proceedings," 71 Fed. Reg. 57873, no such concerns have been cited here, and it is clear that over the last few months, the automatic stay provision has been invoked across a much broader array of cases than this language would support. Indeed, Respondents' arguments here, as well as DHS's current practices, suggest that DHS's new operating theory is that nearly *all* noncitizens subject to removal proceedings are properly subject to mandatory, rather than discretionary, detention, and DHS now appears to be nearly universally implementing the automatic stay with regard to immigration judges' rulings granting petitioners bond, rather than implementing the stay in cases where "important considerations" might call for detention. *See, e.g.*, *Rodriguez v. Bostock*, No. 3:25-cv-05240-TMC, 2025 WL 2782499, at *5 (W.D. Wash. Sept. 30, 2025) (noting that DHS issued a memorandum to all ICE employees on July 8, 2025 which states that "DHS, in coordination with the Department of Justice (DOJ), has revisited its legal position on detention and release authorities" and has determined "that section 235 of the Immigration and Nationality Act (INA), rather than section 236, is the applicable immigration detention authority for *all* applicants for admission") (emphasis added).

ICE's interest in the automatic stay provision "is not a strong one where the 'status quo' that ICE seeks to protect [via the stay] is the detention of an individual who an Immigration Judge has determined does not pose a public safety threat or a risk of flight sufficient to warrant continued confinement"). Not needing to reach the automatic stay issue, the *Hussain* court never evaluated whether any other factors should be considered or whether any contravening due process concerns existed before stating (again, in dicta) that it was "difficult" to see how the petitioner would have been able to prevail on a due process argument. As other courts have found, there are clearly opposing concerns here, including that the approach referred to in *Hussain* "empowers the government to continue detaining someone who has convinced a neutral adjudicator, following a hearing and assessment of the evidence, that his ongoing detention is not warranted." *Sampiao v. Hyde*, 799 F. Supp. 3d 14, 33 (D. Mass. 2025). The *Hussain* court did not consider such factors, likely because it did not need to do so due to the automatic stay issue being moot. Accordingly, while this court will, as appropriate, take the allegedly limited nature of the automatic stay and the "division of authority" the Attorney General has purportedly established into account in evaluating whether the stay comports with due process, the court does not find the form the analysis took in *Hussain* to be compelling here.

As a result, the court finds that the cases cited by Respondents are consistent with applying the *Mathews* factors here, and additionally, do not themselves set forth compelling alternative frameworks for analysis of the due process issue in this context. The court follows the plethora of cases applying the *Mathews* factors in substantively similar or identical contexts and evaluates whether Petitioner's continued detention is justified pursuant to those factors.

### 4. *Whether § 1225 or § 1226 Applies to Petitioner*

Before turning to the *Mathews* factors, the court notes that it recognizes that, as discussed above, its analysis thus far relies on the premise that Judge Corrin has already ruled that Petitioner is subject to a discretionary stay, not a mandatory stay, and that the court does not need to—and perhaps cannot—revisit this ruling. However, the court deems it appropriate to explain that, if it were to reach the issue of whether Petitioner were subject to a mandatory stay or to a discretionary stay, the court would conclude that Petitioner is subject to discretionary detention under § 1226(a), not mandatory detention under any provision of § 1225.

Sections 1225 and 1226 govern detention of noncitizens prior to a final order of removal. *See Jennings*, 583 U.S. at 287. § 1226 "sets forth 'the default rule' for detaining noncitizens 'already present in the United States.'" *Quispe-Ardiles v. Noem*, No. 25-cv-01382-MSN-WEF, 2025 WL 2783800, at *5 (E.D. Va. Sept. 30, 2025) (quoting *Jennings*, 583 U.S. at 303). This section permits, but does not require, the Attorney General to detain noncitizens pending removal proceedings, subject to certain exceptions not applicable here. *Jennings*, 583 U.S. at 303; 8 U.S.C. § 1226(a)(1)-(2) (the Attorney General "*may* continue to detain" or "*may* release" the noncitizen (emphasis added)). "Section 1226(a) thus establishes a discretionary framework for the detention of noncitizens pending removal proceedings." *Briales-Zuniga v. Baltazar*, No. 25-cv-03439-NYW, 2026 WL 35227, at *2 (D. Colo. Jan. 6, 2026).

Section 1225(b) "applies primarily to [noncitizens] seeking entry into the United States," i.e., "applicants for admission." *Jennings*, 583 U.S. at 297. This section provides, in relevant part, that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to

be admitted, the alien *shall* be detained" pending removal proceedings. 8 U.S.C.

§ 1225(b)(2)(A) (emphasis added). Under § 1225(a)(1), an "applicant for admission" is

> [a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters).

Absent an exception for urgent humanitarian reasons not implicated in this case, "detention

under § 1225(b)(2) is considered mandatory," and "[i]ndividuals detained under § 1225 are not

entitled to a bond hearing." *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 484 (S.D.N.Y.

2025) (citing *Jennings*, 583 U.S. at 297); *see also Briales-Zuniga*, 2026 WL 35227, at *2.

### i.    Weight of Authority

The court notes that other courts nationwide have referenced the "near unanimity" of

"[a]t least 50 district court decisions across the United States in the last 6 months alone" which

have found "that DHS's application of the automatic stay pursuant to 8 C.F.R. § 1003.19(i)(2)

violates a non-citizen's due process under the Fifth Amendment." *M.P.L. v. Arteta*, No. 25-cv-

5307-VSB, 2025 WL 3288354, at *7 (S.D.N.Y. Nov. 25, 2025) (collecting cases). Moreover,

Respondents' arguments as to why § 1225 applies to Petitioner in large part echo arguments

rejected by courts across the country and in this judicial district.[8] Courts within this District and

---

[8] *Compare* ECF Nos. 1, 2, and 12 *with, e.g., Espinoza Ruiz v. Baltazar*, No. 25-cv-03642-CNS, 2025 WL 3294762 (D. Colo. Nov. 26, 2025); *Arauz v. Baltazar*, No. 25-cv-03260-CNS, 2025 WL 3041840 (D. Colo. Oct. 31, 2025); *Hernandez Vazquez v. Baltasar, et al.*, No. 25-cv-3049-GPG, ECF No. 22 (D. Colo. Oct. 23, 2025); *Loa Caballero v. Baltasar, et al.*, No. 25-cv-3120-NYW, 2025 WL 2977650 (D. Colo. Oct. 22, 2025); *Moya Pineda v. Baltasar, et al.*, No. 25-cv-2955-GPG, ECF No. 21 (D. Colo. Oct. 20, 2025); *Mendoza Gutierrez v. Baltasar, et al.*, No. 25-cv-2720-RMR, 2025 WL 2962908 (D. Colo. Oct. 17, 2025); *Garcia Cortes v. Noem*, No. 25-cv-

throughout the country have recently concluded that "the plain text and structure of § 1225 and § 1226 support a determination that § 1225(b)(2)(A)'s provision for mandatory detention 'does not apply to someone like [Petitioner], who has been residing in the United States for more than two years.'" *Hernandez v. Baltazar*, No. 25-cv-03094-CNS, 2025 WL 2996643, at *4 (D. Colo. Oct. 24, 2025) (quoting *Lopez Benitez v. Francis*, 795 F.Supp.3d 475, 484 (S.D.N.Y. 2025); *see also, e.g.*, *Gomes v. Hyde*, No. 25-cv-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025) ("[T]he plain text of Sections 1225 and 1226, together with the structure of the larger statutory scheme, indicates that Section 1225(b)(2) does not apply to noncitizens who are arrested on a warrant issued by the Attorney General while residing in the United States."); *Martinez v. Hyde*, No. 25-cv-11613-BEM, 2025 WL 2084238, at *7-8 (D. Mass. July 24, 2025) (concluding that the textual "tension between sections 1225 and 1226 motivates the conclusion that they apply to different classes of aliens," and that given the "line historically drawn between these two sections, making sense of their text and the overall statutory scheme, is that section 1225 governs detention of non-citizens 'seeking admission into the country,' whereas section 1226 governs detention of non-citizens 'already in the country'") (citations omitted); *Mendoza Gutierrez*, 2025

---

02677-CNS, 2025 WL 2652880 (D. Colo. Sept. 16, 2025); *Marquez Rico v. Baltazar, et al.*, No. 25-cv-3543-CNS (D. Colo. Dec. 16, 2025); *Carrillo Fernandez v. Knight*, No. 2:25-CV-02221-RFB-BNW, 2025 WL 3485800 (D. Nev. Dec. 4, 2025); *Garcia-Arauz v. Noem*, No. 2:25-cv-02117-RFB-EJY, 2025 WL 3470902 (D. Nev. Dec. 3, 2025); *Escobar Salgado v. Mattos*, No. 2:25-cv-01872-RFB-EJY, 2025 WL 3205356 (D. Nev. Nov. 17, 2025); *Ramos v. Rokosky*, No. 25-cv-15892 (EP), 2025 WL 3063588 (D.N.J. Nov. 3, 2025); *Godinez-Lopez v. Ladwig*, 2025 WL 3047889 (W.D. Tenn. Oct. 31, 2025); *Jimenez v. FCI Berlin, Warden*, No. 25-CV-326-LM-AJ, 2025 WL 2639390 (D.N.H. Sept. 8, 2025); *Lopez-Campos v. Raycraft*, No. 2:25-cv-12486, 2025 WL 2496379 (E.D. Mich. Aug. 29, 2025); *Romero v. Hyde*, No. 25-cv-11631-BEM, 2025 WL 2403827 (D. Mass. Aug. 19, 2025); *Lopez Benitez v. Francis*, No. 25-cv-5937 (DEH), 795 F.Supp.3d 475 (S.D.N.Y. Aug. 13, 2025).

WL 2962908, at *5 ("[Section] 1225's provision for mandatory detention of noncitizens 'seeking admission' does not apply to someone like [Mr. Gutierrez], who has been residing in the United States for more than two years." (collecting cases)); *Jimenez*, 2025 WL 2639390, at *8 ("Because § 1225(b)(2)(A) applies to applicants for admission who are seeking to enter the United States, it cannot apply to Jimenez, who has already entered the country and has been residing here for over two years.").

Respondent argues that "[t]here is no question in this case that Petitioner is 'seeking admission' to the United States, as an applicant for admission who is also seeking asylum," which Respondent states makes Petitioner an "applicant for admission" and therefore subject to the "mandatory" detention provision of § 1225(b)(2)(A). The court acknowledges that Petitioner is positioned somewhat differently from many of the petitioners in other cases because he has an active asylum application. Nonetheless, because of the title of § 1225, which reads "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing," and limiting language within a sub-provision of § 1225 regarding detention of noncitizens who cannot show they have been in the United States for more than two years, nearly identical arguments have been rejected by judges in this District and others. *See, e.g.*, *Hernandez v. Baltazar*, 2025 WL 2996643, at *5 (the title of § 1225 clearly indicates that the statute governs "arriving" noncitizens, not those present in the United States already), *6 (the fact that "§ 1225(b)(1)(A)(iii)(II)'s language explicitly limit[s] mandatory detention to noncitizens who have been in the U.S. for *less than two years*" suggests that § 1225 is not meant to apply to noncitizens who have been in the U.S. for significantly longer) (emphasis in original) (collecting cases); *Barrera v. Tindall*, No. 25-cv-541-RGJ, 2025 WL 2690565, at *4 (W.D. Ky. Sept. 19,

2025) (the title of § 1225 reflects that it "is limited to noncitizens arriving at a border or port and [ ] presently 'seeking admission' into the United States"); *Pizarro Reyes v. Raycraft*, No. 25-cv-12546, 2025 WL 2609425, at *5 (E.D. Mich. Sept. 9, 2025) ("The use of 'arriving' to describe noncitizens strongly indicates that the statute governs the *entrance* of noncitizens to the United States," and this reading is bolstered by the "inspection scheme" and discussions of stowaways and crewmen in § 1225); *Zumba v. Bondi*, No. 25-cv-14626 (KSH), 2025 WL 2753496, at *8 (D.N.J. Sept. 26, 2025) (concluding that detention authority arising from § 1225 is properly exercised at or near the port of entry, while detention authority arises from § 1226 when a noncitizen is arrested in the interior of the United States, in part because "the titles and headings of § 1225 repeatedly cabin its application to 'Inspections,' which, as petitioner convincingly argues, occur at ports of entry, their functional equivalent, or near the border"); *cf. Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (the Supreme Court has "long considered" that the title of a statute and the heading of a section are tools available for resolution of a doubt about the meaning of a statute). The court finds the reasoning set forth in these cases compelling and agrees with these numerous decisions holding that § 1225 applies to *arriving* noncitizens seeking admission, while § 1226 applies to noncitizens like Petitioner who are already present in the United States.

## ii.    *Rojas*

Respondents have cited only *one* case nationwide in which they say a federal court ruled in their favor while directly reaching the proposition that DHS's application of the automatic stay does *not* violate a noncitizen's due process rights. Within their briefing, Respondents only briefly refer to this one case, *Rojas v. Olson*, 2025 WL 3033967, in arguing that the automatic stay is not

ultra vires; at oral argument, however, Respondents clarified that they believe *Rojas* also supports the proposition that DHS's application of the automatic stay does not violate a noncitizen's due process rights, although their development of this argument was somewhat cursory. When pressed at oral argument, Respondents also acknowledged that no courts within this Circuit have reached similar rulings.

Several courts have directly rejected the analysis in *Rojas* on multiple grounds, stating, inter alia, that the argument addressed above regarding the title and specific language of § 1225 "reinforces the interpretation that Section 1225(b)(2) is more limited in scope" than *Rojas* would suggest, *Edahi v. Lewis*, No. 25-cv-129-RGJ, 2025 WL 3466682, at *7 (W.D. Ky. Nov. 27, 2025); that "[r]eading the statute as *Rojas* contends would either ignore the plain meaning of 'seeking' . . . or, more simply, read[s ]out 'seeking' directly from the statute," *id*. at *10; that "reading 1225 to apply instead of 1226 to detention would render the Laken Riley amendments pointless" and would lead to two separate clauses performing the same work, *id.* at *11; that "*Rojas* mentions the title [of 1225] but does not grapple with its text or meaning," *id*.; and that *Rojas*, despite acknowledging that most other courts disagree with its holding, engages with "the reasoning of only one contrary case within the Seventh Circuit." *Singh v. Lewis*, No. 25-cv-133-DJH, 2025 WL 3298080, at *4 (W.D. Ky. Nov. 26, 2025).

The court agrees with the detailed, thorough, and reasoned analyses in these rulings. First, the court's analysis above regarding the title of § 1225, as well as language within the relevant provisions of that section, applies equally here. The court in *Rojas* dealt with seemingly related arguments in reaching its ruling, but provided only limited analysis of the issue and concluded simply that "nothing in the provision suggests the intention [petitioner] proposes."

2025 WL 3033967, at *8. For the reasons stated above, the court disagrees, agrees instead with *Edahi* that *Rojas* "mentions the title [of 1225] but does not grapple with its text or meaning," and finds that, as addressed above, several elements of § 1225 provide strong support for Petitioner's desired interpretation here.

Second, as the court in *Edahi* notes, "the Laken Riley Act recently amended Section 1226." 2025 WL 3466682, at *5. "Now, as codified in Section 1226(c), the Attorney General *must* detain a noncitizen if (i) the noncitizen is inadmissible because they are in the United States without being admitted or paroled, obtained documents for admission through misrepresentation or fraud, or lacks valid documentation, or, 'is charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person.'" *Id*. at *5 (emphasis added). "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995). "The Laken Riley Act added new mandatory detention provisions to an otherwise discretionary statute. If Section 1225(b)(2)(A) governed certain noncitizens as the United States claims it does, the Laken Riley Act would have been redundant and unnecessary." *Edahi*, 2025 WL 3466682, at *7. This is "because an alien present in the United States without admittance would be unlikely to prove that they are 'clearly and beyond a doubt entitled to be admitted,' [so] ICE would never need to rely on § 1226(c)(1)(E) to detain them." *Pizzaro Reyes v. Raycraft*, No. 25-cv-12546, 2025 WL 2609425, at *5 (E.D. Mich. Sept. 9, 2025) (quoting § 1225(b)(2)(A)). And further, "[courts] do not lightly assume Congress adopts two separate clauses in the same law to perform the same

work." *United States v. Taylor*, 596 U.S. 845, 857 (2022).

Accordingly, *Rojas*'s "interpretation of Section 1225(b)(2)(A) would either result in a statutory scheme that 'ICE would never need to rely on' or [ ] Section 1226(c)(1)(E) would now be 'redundant' with 1225(b)(2)(A) as both provisions regulate the mandatory detention of the same category of noncitizens as defined in Section 1182(a)(6)(A)(i)." *Edahi*, 2025 WL 3466682, at *11. In other words, there would be no need to enact § 1226(c)(1)(E) if § 1225(b)(2)(A) already covers the same ground. "Therefore, contrary to *Rojas*, the 'newly added provisions' of the Laken Riley Act *do* indicate that a better interpretation of the interplay between Section 1225 and Section 1226 likely does exist." *Id*. Moreover, this reading of the interplay between § 1225 and § 1226, unlike the court's reading in *Rojas*, "avoid[s] a reading which renders some words altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995); *see also, e.g.*, *Chilel v. Sheehan*, No. C25-4053-LTS-KEM, 2025 WL 3158617, at *2 (N.D. Iowa Nov. 12, 2025) (declining to follow *Rojas* and the United States's interpretation of § 1225 as it relates to the Laken Riley Act, and finding that the court "must reject reading in the superfluousness that the Government requests").

### iii.    *Hurtado*

*Rojas* also cites *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (2025), a BIA decision, which Respondents cite within their briefing as well. *Rojas* acknowledges that *Hurtado* "has no precedential value and . . . is merely an agency interpretation to which the Court should give no deference," but nonetheless stated that it found "its thorough analysis persuasive," though without explaining why. The court agrees that *Hurtado* has no precedential value here. *See, e.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (district courts have no obligation

to defer to the BIA); *Murillo-Chavez v. Bondi*, 128 F.4th 1076, 1086-87 (9th Cir. 2025) (holding that after *Loper Bright*, BIA decisions "have only that power [to persuade] and we 'need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous'") (quoting *Loper Bright*, 603 U.S. at 413); *Rodriguez v. Bostock*, No. 25-cv-05240-TMC, 2025 WL 2782499, at *26 (W.D. Wash. Sept. 30, 2025) (holding the same).

The court also finds *Hurtado*'s analysis unpersuasive. In citing *Hurtado*, Respondents argue that the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208 (Sept. 30, 1996), shows that Petitioner is properly detained under § 1225. This argument has previously been rejected on numerous occasions by courts within this District and other courts nationwide. *See Hernandez v. Baltazar*, 2025 WL 2996643, at *7 (concluding of a substantively identical legislative history argument regarding the IIRIRA that "[t]he Court joins the many other courts nationwide who have declined to accept Respondents' novel new interpretation of decades-old law"); *7 n.3 (collecting cases); *Buenrostro-Mendez v. Bondi*, No. H-25-3726, 2025 WL 2886346, at *3 (S.D. Tex. Oct. 7, 2025) ("As almost every district court to consider this issue has concluded, 'the statutory text, the statute's history, Congressional intent, and § 1226(a)'s application for the past three decades' support finding that § 1226 applies to these circumstances.") (citation omitted).

The court finds the analysis articulated in these cases compelling and adopts it in rejecting Respondents' legislative history arguments. Additionally, the court notes that "the BIA's current position is inconsistent with its earlier pronouncements." *Rodriguez v. Bostock*, 2025 WL 2782499, at *26. Among other inconsistencies, the BIA previously "stated unequivocally that a noncitizen who had entered the United States unlawfully three years earlier was subject to

discretionary detention under section 1226(a)" in *Matter of Akhmedov*, 29 I&N Dec. 166 (BIA 2025). *Rodriguez v. Bostock*, 2025 WL 2782499, at *26. And "[a]s recently as August 4, 2025, the Attorney General designated the Board's decision in *Matter of Akhmedov* 'as precedent in all proceedings involving the same issue or issues.'" *Id.* (citing 29 I&N Dec. at 166 n.1). "An agency's power to persuade rests at least in part on its consistency with earlier and later pronouncements." *Id.* (cleaned up) (citing *Loper Bright*, 603 U.S. at 432-33) (also noting other inconsistencies between the BIA's current position and earlier pronouncements). The court finds *Hurtado*'s analysis to be inconsistent with its earlier pronouncements and therefore unpersuasive.

Moreover, *Hurtado* relies in part on the conclusion that this court's preferred interpretation of the interplay between § 1225 and § 1226 subsequent to the Laken Riley Act, as discussed above, "would, in fact, render . . . § 1225(b)(2)(A)[ ] superfluous." 29 I&N Dec. at 222. *Hurtado* does not elaborate upon this point, and the court finds it to be incorrect. That provision refers to "the case of an alien who is an applicant for admission," 8 U.S.C. § 1225(b)(2)(A); as the court explains above, the court's interpretation of § 1226 would not cover aliens who present themselves or are detained when they are crossing the border, so § 1225(b)(2)(A) would still be applicable to such aliens. Thus, despite what *Hurtado* says, the provision would not be rendered superfluous under the court's preferred interpretation.

Finally, even if the analysis provided in *Hurtado* was sound, the court also notes that the legislative history analysis set forth in *Hurtado* is largely, and perhaps entirely, *consistent* with Petitioner being detained subject to § 1226(a). *Hurtado* argues that the legislative history of the IIRIRA stresses that "illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present

themselves for inspection at a port of entry" and, further, that "'aliens who have entered without inspection are deportable under section 241(a)(1)(B). Under the new 'admission' doctrine, such aliens will not be considered to have been admitted' . . . . Thus, after the 1996 enactment of IIRIRA, aliens who enter the United States without inspection or admission are 'applicants for admission' under . . . 8 U.S.C. § 1225(a)(1), and subject to the inspection, detention, and removal procedures of . . . 8 U.S.C. § 1225(b)." 29 I&N Dec. at 223-24. Here, however, the parties do not dispute that Petitioner *was* inspected at the border upon his entry to the United States and was subsequently released into his mother's care. Accordingly, the concerns raised in *Hurtado's* legislative history analysis do not suggest that Petitioner is subject to mandatory detention or that his circumstances would warrant such detention.

The court therefore rejects the legislative history analysis delineated in *Hurtado*, as well as its ultimate holding, and additionally concludes that the case has no precedential value here.

For the reasons stated above, the court does not find the arguments raised by Respondents in favor of applying § 1225 to Petitioner to be compelling. If this court were to reach the issue of whether § 1225 or § 1226 applies to Petitioner here, the court would conclude that Petitioner is subject to discretionary detention under § 1226(a), not mandatory detention under any provision of § 1225.

### 5.    *Mathews Due Process Analysis*

Pursuant to *Mathews*, courts weigh the following three factors in evaluating due process claims: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest,

including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The court notes that the question at issue here is "whether a regulation can permit an agency official to unilaterally detain a person after a judge has ordered the person's release . . . ." *Gunaydin*, 784 F. Supp. 3d at 1185.

### i.    Respondents' Arguments

In turning to analyze the *Mathews* factors, the court notes that Respondents, presumably because of their position that the *Mathews* factors should not be applied in this context, have offered no argument as to what the outcome of the court's due process analysis under *Mathews* should be. However, the court notes multiple concerns raised by Respondents that bear upon the court's analysis here.

First, Respondents contended at oral argument that, in finding that the automatic stay violates due process, many courts have unduly focused on the supposedly "indefinite" nature of the automatic stay. As discussed above, Respondents cite *Demore* for the proposition that "noncitizens who [a]re convicted of certain crimes may be detained during the course of their removal proceedings"—in part because of the "definite termination point" of the end of removal proceedings—then argue that this principle should be extended to *all* noncitizens undergoing removal proceedings. *Id*. at 531. As the court explains above, Respondents do not address the point that the plain language of the regulations provides for fundamentally different treatment of noncitizens in discretionary detention pursuant to § 1226(a) and noncitizens in mandatory detention pursuant to § 1226(c) or § 1225(b)(2)(A).

Moreover, even assuming that due process issues are, in principle, somewhat ameliorated

here by the alleged "definite termination point" to Petitioner's detention, Respondents raise no argument regarding whether, how, or why this court should weigh this factor against the fact that federal regulations entitle "aliens detained under § 1226(a) [to] receive bond hearings at the outset of detention," *Jennings*, 583 U.S. at 306. This fact clearly carries significant, if not dispositive, weight in the due process analysis, and Respondents have offered no reason for the court to conclude that the alleged "definite termination point" of the stay should outweigh this, or any other, consideration here. *Cf., e.g.*, *Lopez-Arevelo v. Ripa*, No. 25-cv-337-KC, 2025 WL 2691828, at *7 (W.D. Tex. Sept. 22, 2025) (holding that because the petitioner "challenges his ongoing detention on constitutional grounds, as a violation of due process" and "not on statutory interpretation grounds, . . . the Court need not consider whether the agency's new mandatory detention policies reflect a proper reading of the INA. The issue, instead, is whether those policies have been applied to [the petitioner] in an unconstitutional manner.").

Second, at oral argument, Respondents argued that courts have misunderstood the interplay between the DHS and the Attorney General's authority in this context. Relatedly, Respondents contended that, in similar contexts, courts have focused to an unwarranted degree on the fact that immigration judges had already found that the petitioners at issue merited release on bond. Because the Attorney General has allegedly reserved any "final" decision in this context for the BIA, and has accordingly left room for the DHS to implement a stay of the immigration judge's ruling before the BIA has reached a "final" decision, Respondents maintain that Petitioner's due process challenge must fail.

As authority for this position, Respondents point to *Hussain*, which the court has discussed at length above. As the court has explained, it does not find the Respondents' interest

31

in the automatic stay provision to be a strong one. *See, e.g.*, *Maza*, 2025 WL 2951922, at *4 (finding that ICE's interest in the automatic stay provision "is not a strong one where the 'status quo' that ICE seeks to protect [via the stay] is the detention of an individual who an Immigration Judge has determined does not pose a public safety threat or a risk of flight sufficient to warrant continued confinement").

Additionally, the court agrees with other courts that have accorded significant weigh in their analysis to the fact that an immigration judge has found in favor of Petitioner significant weight in their analyses. The decision by an immigration judge to release Petitioner on bond here makes the automatic stay the "but for" cause of his detention. Even setting aside the fact that an impartial judge has ruled in Petitioner's favor, it is clearly highly relevant that Petitioner would no longer be detained except for the stay, whether or not the immigration judge's decision can be deemed "final." And assuming, for argument's sake, that the court agrees with Respondents that the DHS has not infringed upon the Attorney General's authority in the underlying immigration proceedings, this consideration merits little or no weight in this court's due process analysis. *See, e.g.*, *Hernandez-Lara*, 10 F.4th at 28 (the "fact that some detention is permissible does not change the fact that a detainee suffers significant liberty deprivations. Moreover, the government's exercise of its power to detain immigrants pending removal 'is subject to important constitutional limitations.'") (quoting *Zadvydas*, 533 U.S. at 695); *Lopez-Arevelo*, 2025 WL 2691828, at *7 (where petitioner's challenge is to due process, not to respondents' preferred interpretation of the INA, "the Court need not consider whether the agency's new mandatory detention policies reflect a proper reading of the INA. The issue, instead, is whether those policies have been applied to [petitioner] in an unconstitutional manner."); *Maza*, 2025 WL

2951922, at *4 (the validity of respondents' statutory arguments in support of detention on appeal had "no bearing on whether Petitioner is currently detained under the automatic stay regulation in violation of his due process rights").

### ii.    Application of *Mathews*

Turning, therefore, to the *Mathews* factors, the court first finds that Petitioner has a significant private liberty interest at stake. Petitioner's interest in physical freedom "is the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004); *see Vizguerra-Ramirez v. Baltazar*, 2025 WL 3653158, at *13 (same); *Carlon*, 2025 WL 2624386, at *3 (same); *Gunaydin*, 784 F. Supp. 3d at 1187 (same); *see also Hamdi*, 542 U.S. at 529 (directing courts, when assessing the first *Mathews* factor, to consider only the petitioner's interests at stake in ongoing detention without consideration of the respondents' justifications for the detention); *Zadvydas*, 533 U.S. at 690 (stating that an individual's interest in being free from detention "lies at the heart of the liberty that [the Due Process] Clause protects"). Petitioner is being held in an ICE detention facility and is far from his family. *See Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (finding, in assessing the first *Mathews* factor, that "[t]he deprivation [petitioner] experienced while incarcerated was, on any calculus, substantial. He was locked up in jail. He could not maintain employment or see his family or friends or others outside normal visiting hours."). This is despite him not being accused of any crime. *See, e.g.*, *Maza*, 2025 WL 2951922, at *3.

Second, there is a large risk of erroneous deprivation of Petitioner's liberty interest through the procedures used in this case, and there are alternative procedures available which would ameliorate those risks. The risk of deprivation is high because "the only individuals

subject to the automatic stay are those who, by definition, prevailed at their bond hearing." *Carlon*, 2025 WL 2624386, at *3; *see, e.g.*, *Gunaydin*, 784 F. Supp. 3d at 1187 (same). Despite a neutral decision-maker finding that a bond was warranted here, the automatic stay provision allowed Respondents to unliterally deprive Petitioner of his liberty. Consequently, "the automatic stay regulation empowers ICE—the losing party in the bond hearing—to unilaterally override the decision of the [Immigration] Judge and keep the noncitizen detained pending appeal. Such a rule allows the government to bypass its burden of proof at bond hearings and usurp the role of the Immigration Judge." *Sampiao*, 799 F. Supp. 3d at 32. "Other courts considering the automatic stay provision have found this problematic as well." *Carlon*, 2025 WL 2624386, at *3; *see, e.g.*, *Zavala v. Ridge*, 310 F. Supp. 2d 1071, 1077-78 (N.D. Cal. 2004) (recognizing that "[a] unilateral determination made by the [Immigration and Naturalization] Service attorney that effectively overrules the reasoned decision of the Immigration Judge poses a serious risk of error" in that "it conflates the functions of adjudicator and prosecutor"); *Ashley*, 288 F. Supp. 2d at 668, 671 (automatic stay regulation produces a "patently unfair situation by 'tak[ing] the stay decision out of the hands of the judges altogether and giv[ing] it to the prosecutor who has by definition failed to persuade a judge in an adversary hearing that detention is justified'" and "renders the Immigration Judge's bail determination an empty gesture").

"The automatic stay regulation also inverts the traditional burdens and standards governing requests for stays pending appeal." *Sampiao*, 799 F. Supp. 3d at 32. The stay provision does not require DHS to consider or demonstrate any individualized facts or show a likelihood of success on the merits. *See* 8 C.F.R § 1003.19(i)(2) (stating that the stay is automatic and the bond "shall be stayed" upon filing of the form EOIR-43). "[A] stay of an order directing the release of

a detained individual is an 'especially' extraordinary step, because '[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'" *Gunaydin*, 784 F. Supp. 3d at 1187 (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). "Ordinarily, to obtain a stay of a judge's order requires a party to, <u>inter alia</u>, make 'a strong showing' that it is likely to succeed on the merits of its challenge to that order." *Maza*, 2025 WL 2951922, at *4 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). By contrast, the automatic stay regulation "turns these well-established procedural principles on their heads and carries a significant risk of erroneous deprivation." *Gunaydin*, 784 F. Supp. 3d at 1187; *see also Vizguerra-Ramirez*, 2025 WL 3653158, at *14 (finding that these circumstances unfairly put petitioners "in the more difficult position of proving a negative—that is, proving that [they are] neither a flight risk nor a danger to the community"); *L.G. v. Choate*, 744 F. Supp. 3d at 1183-84 (same). "By flipping the traditional rules governing requests to stay pending appeal, the automatic stay regulation invites significant risk of error in decisions that deprive individuals of their liberty." *Sampiao*, 799 F. Supp. 3d at 33. And although these concerns are slightly alleviated by the "definite termination point" Respondents argue applies to Petitioner's detention pursuant to the automatic stay, the court's analysis above does not turn on whether Petitioner's detention is indefinite. Even if Petitioner's liberty interest will not be indefinitely deprived here, it is nonetheless clear that the stay infringes heavily upon his liberty interest.

"As to available alternatives, the regulations already provide one: DHS may request a discretionary emergency stay from the BIA." *Carlon*, 2025 WL 2624386, at *4; *see* 8 C.F.R. § 1003.10(i)(1) (granting BIA discretionary stay authority); *Gunaydin*, 784 F. Supp. 3d at 1190 ("Respondents' interest in preserving the automatic stay regulation is almost entirely, if not

entirely, reduced by the mechanisms already in place for requesting an emergency stay from the BIA."). This procedure, at minimum, mitigates the concern about DHS usurping the neutral adjudicatory role of an Immigration Judge and provides additional safeguards that the automatic stay provision lacks.

Lastly, as to the third *Mathews* factor, there is not a significant governmental interest at stake in Petitioner's detention pursuant to the automatic stay. As discussed above, whether the agency's new mandatory detention policies reflect a proper reading of the INA is not a compelling consideration in a due process context. Moreover, as stated above, ICE's interest in the automatic stay provision "is not a strong one where the 'status quo' that ICE seeks to protect [via the stay] is the detention of an individual who an Immigration Judge has determined does not pose a public safety threat or a risk of flight sufficient to warrant continued confinement." *Maza*, 2025 WL 2951922, at *4.

Respondents state in a footnote that the Department of Justice has "justified its interest in the stay rule with statistics about the difficulties of removing aliens who were *not* detained, establishing a strong interest in preventing flight risks." Response at 10 n.3 (emphasis in original). However, this issue is addressed by Judge Corrin's finding that the $25,000 bond is "sufficient to establish that [Petitioner] will not pose a flight risk." ECF No. 1-1 at 53; *see, e.g.*, *Sampiao*, 799 F. Supp. 3d at 33-34 ("The government does, indeed, have a legitimate interest in ensuring noncitizens' appearance at removal proceedings and preventing harms to the community, but noncitizens subject to the automatic stay regulation have been deemed, subject to a bond order, to *not* pose such risks.") (emphasis in original) (citation omitted).

Moreover, the public interest favors Petitioner rather than Respondents here. Unnecessary

detention "imposes substantial societal costs," as it "'separates families and removes from the community breadwinners, caregivers, parents, siblings and employees.'" *Hernandez-Lara*, 10 F.4th at 33 (quoting *Velasco Lopez*, 978 F.3d at 855). Petitioner has experienced these hardships; he has no criminal record, but has nevertheless been arrested and has been held in detention separate from his broader community. The "ruptures in the fabric of communal life" wrought by unnecessary detention, though "difficult to capture in dollars and cents," likewise support Petitioner challenge to the automatic stay regulation. *Id*.; *see Sampiao*, 799 F. Supp. 3d at 34 (reaching a similar conclusion). Thus, the court concludes that the government's interest here is minimal, especially in contrast to the significant countervailing interests at stake for the Petitioner.

In conclusion, all three *Mathews* factors favor Petitioner's position, and the court finds that the automatic stay regulation, 8 C.F.R § 1003.19(i)(2), violates Petitioner's procedural due process rights under the Fifth Amendment. Accordingly, Petitioner is entitled to release upon posting bond.

**B.     Substantive Due Process**

Petitioner also asserts that the automatic stay violates his substantive due process rights. Because the court has already awarded Petitioner the relief he requests, the court need not reach this issue. Nevertheless, the court notes that "[c]ivil detention violates the Fifth Amendment's Due Process Clause unless 'a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Maza*, 2025 WL 2951922, at *5 (quoting *Zadvydas*, 533 U.S. at 690). Respondents have asserted no such special justification here.

As mentioned above, Respondents state in a footnote that the Department of Justice has

"justified its interest in the stay rule with statistics about the difficulties of removing aliens who were *not* detained, establishing a strong interest in preventing flight risks." Response at 10 n.3. But as addressed above, Judge Corrin accounted for that risk in setting Petitioner's bond. *Maza*, 2025 WL 2951922, at *5 (noting the same consideration in addressing petitioner's substantive due process claim). Where Judge Corrin has determined that bond is sufficient to mitigate the risk that Petitioner would flee during removal proceedings, Respondents' interest in securing his presence via detention "in contravention of the order of a neutral fact-finder[ ] does not outweigh the liberty interest at stake." *Jacinto v. Trump*, 796 F. Supp. 3d 584, 592 (D. Neb. 2025); *see Maza*, 2025 WL 2951922, at *5 (reaching a substantively identical conclusion and, accordingly, concluding the court's substantive due process analysis).

### C.    Sufficiency of Analysis

The court finds that its analysis may conclude here. Petitioner also raises an ultra vires argument and asserts that his detention violates the "*Accardi* doctrine,"[9] while Respondents oppose these arguments. However, these arguments need not be adjudicated  at this time because the court finds that it is able to grant the relief Petitioner seeks based upon either his substantive due process argument or procedural due process argument alone. *Cf., e.g.*, *Hernandez v. Baltazar*, 2025 WL 2996643, at *8 (where the parties disputed whether petitioner was properly detained pursuant to § 1225 or § 1226(a), granting petitioner a bond hearing pursuant to § 1226(a), but declining to reach petitioner's due process claim due to having already afforded him

---

[9] "The *Accardi* doctrine stands for the unremarkable proposition that an agency must abide by its own regulations . . . . The *Accardi* doctrine is not an independent cause of action; rather, it is merely a doctrine upon which to base a . . . due process claim." *Ajaj v. United States*, No. 14-cv-01245-SMY, 2015 WL 14097638, at *2 (S.D. Ill. Dec. 29, 2015) (citations omitted).

the relief he sought). If Respondents fail to release Petitioner for any reason, Petitioner may renew these claims. *See, e.g.*, *id.*

As for Petitioner's request for costs and fees, "the Court notes that under Local Rule 54.3, 'a motion for attorney fees shall be supported by affidavit.' Therefore, Petitioner may file a motion for attorney fees that complies with the applicable rules." *L.G. v. Choate*, 744 F. Supp. 3d at 1187 (citations omitted); *see also Loa Caballero v. Baltazar*, No. 25-cv-03120-NYW, 2025 WL 2977650, at *9 n.8 (D. Colo. Oct. 22, 2025) (holding the same).

## CONCLUSION

For the foregoing reasons, the court respectfully **GRANTS** Petitioner's Petition for Writ of Habeas Corpus, ECF No. 1. Accordingly, the court **DENIES as moot** Petitioner's Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 2, which requests similar relief to that sought in the Petition for Writ of Habeas Corpus. Before being released on bond, Petitioner must re-post the $25,000 bond set by Judge Corrin. Once this has occurred, Respondents are ordered to immediately release Petitioner from custody under reasonable conditions of supervision. Respondents are also ordered to file a status report in order to certify compliance within seven days of the issuance of this order or within three days of Respondents posting bond, whichever comes sooner.

DATED: January 12, 2026                    BY THE COURT:

_____

Susan Prose
United States Magistrate Judge